GEORGE BROUILLETTE *vs.* CONNECTICUT RIVER RAILROAD COMPANY.

Hampden.    September 26, 1894. — October 18, 1894.

Present: ALLEN, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Personal Injuries — Railroad — Employers' Liability Act — Law and Fact — Evidence.*

A wire, which is a part of the electric signal system of a railroad, used to connect the joints of the rails so as to insure the transmission of the electrical current, affixed to the rail at either end by a bolt, and running along the rail until it reaches a sleeper, then running out on the sleeper in a loop, and fastened at the end and each corner of the loop by staples, is a part of the " ways, works, or machinery " of the railroad, within St. 1887, c. 270, § 1, cl. 1.

In an action against a railroad corporation for personal injuries occasioned to the plaintiff while in its employ, it appeared that he was tripped by a wire, which was used as a part of the electric signal system of the railroad to connect the joints of the rails, and which projected above the rail, and was run over by a train while, in the course of his employment, crossing the tracks upon which trains were passing in opposite directions. The evidence was conflicting as to the nature of his employment, his evidence tending to show that he was em-

ployed as a brakeman during a portion of the day, and that at other. times he assisted in repairing the electrical apparatus; and the defendant's evidence tending to show that he had charge of its electric system. The evidence was conflicting also upon the question whether it was necessary for him to use the tracks as he did, and upon other questions. *Held,* that it was error to rule, as matter of law, that the action could not be maintained; and that the case should have been submitted to the jury.

Evidence that a person in the employ of a railroad corporation has boasted of his ability to keep out of the way of trains and not get hurt, is admissible in an action by him against the corporation for personal injuries occasioned by being run over by a train while, in the course of his employment, crossing the tracks upon which trains were passing in opposite directions.

TORT, under the employers' liability act, St. 1887, c. 270, for personal injuries occasioned to the plaintiff while in the defendant's employ. Trial in the Superior Court, before *Maynard*, J., who allowed a bill of exceptions, in substance as follows.

The plaintiff testified that he was employed by the defendant as a spare passenger brakeman, so called ; that it was his regular duty to act as brakeman on the 6.20 A. M. train from Holyoke to Springfield, then to take the 6.50 A. M. train from Springfield to Brightwood as conductor, and bring it back to the Springfield yard without passengers, arriving there about 7.05 A. M. ; that again it was his regular duty, at 5.45 P. M., to act as brakeman on a train from Springfield to Holyoke, which was his last regular duty of the day ; and that between 7.05 o'clock A. M. and 5.45 o'clock P. M. he held himself subject to the orders of one Ray, who used to be called the head conductor, and who had charge of all the brakemen, conductors, and baggage-masters, and to whom the plaintiff was in the habit of reporting regularly.

On cross-examination, the plaintiff testified as follows: " I went to work for the Connecticut River Railroad Company in August, 1885, working in the yard at Holyoke, switching. I stayed there until January 10, 1886, then I went to work as a passenger brakeman with Conductor Miller, to learn to run. I worked on that train for about a week or a week and a half ; then I went to work on the head end of the mail train for about a week, and then went on the hind end of the mail train to Windsor, Vermont, for a few days. I continued to be brakeman every day until I was injured. At the time of my injury I came down with Mr. French on the 6.20 train out of Holyoke ; then I ran the 6.50 train to Brightwood, which is two miles and

a fraction from Springfield; then I used to go into the office and wait for orders.   I did not brake after that until 5.45 at night. I used to help the conductor on the 5.45 train; the brakeman had to help the conductor take tickets; the train went to Northampton, I got off at Holyoke.   I got back from Brightwood in the morning at 7.05; between 7.05 in the morning and 5.45 at night what I did depended upon what Mr. Ray gave me orders to do. If there was a brakeman off, he would send me on to take his place.   I never made any record of the number of times I went out as brakeman after 7.05 and before the 5.45 train in the month previous to my accident.   My main business was not tending the electric signals; I did not have charge of all the work that was done on the electric signals; Mr. Ray had charge. I have seen him work at Holyoke and at Springfield on the electric signals this very same year.   I have seen him work at Holyoke a good many times; if he did n't find anybody, he used to go himself.   I was not sent to put the wires on the rails all the way from Springfield to Northampton; the head man put the wires on the rails.   Dennis Sullivan was the head man; Sullivan did not work under me; he was sent to work with me. I do not know who put the wires in at the point where I was hurt.   I did not put the wires in; I never had any occasion to repair any of the wires in that spot; I have in other spots; if the signal was wrong, caused by a broken wire, I used to put them in sometimes, — not very often; sometimes a week and sometimes two or three weeks would elapse during which I would not go over the tracks on foot."

On re-direct examination, he testified as follows: " I wore a uniform of plain blue cloth, with buttons on the cap, and a badge on the cap; on the badge it said, ' Brakeman, Connecticut River '; I wore that right along; my wages were $1.75 a day and my regular day was from 6.50 in the morning, when I started for Brightwood.   Mr. Ray told me that if I would come down with Mr. French every morning and help him he would allow me a quarter of a day extra; when I came down on the 6.20 train they gave the extra quarter of a day, and when I did not come down on the 6.20 they did not give it to me.   They had on the Connecticut River Railroad at that time what is known as regular brakemen and spare brakemen; I was a spare brakeman;

they have spare brakemen, because sometimes a man might be taken sick and they have got to have a man to take his place. I was for many months and years the only spare brakeman they had ; sometimes, in the summer time, they used to have two or three, — two were the most I ever saw.   In the discharge of my duties, I had nothing to do with examining or looking over the tracks or these electric appliances."

The evidence for the plaintiff further tended to show that, on the Saturday previous to the accident, which happened on Mon, day, December 5, 1892, the plaintiff had received orders from Ray to move a certain signal near the Plainfield Street bridge, so called, about three fourths of a mile north of the scene of the accident.   The plaintiff and one Sullivan had worked on this matter all day Saturday, and had not finished it.   On Monday morning, after returning from Brightwood and leaving the train in the Springfield yard, the plaintiff went down to the pay car, which was standing on a track running into the roundhouse, some distance south of the scene of the accident.   The plaintiff received his pay and went from the pay car to the carpenter shop to get a board to finish the work of moving the signal.   He then went back to the pay car to hurry up Sullivan, who was again working with him.   The plaintiff and Sullivan then started from the pay car and went north between the mail track and the down main track, so called, the mail track being the one directly west of the down main track.   They walked side by side until they reached the south end of the paint shop, where the plaintiff crossed over the down main track and continued along north in the clear space between the two main tracks, Sullivan walking between the rails of the down main track.   The distance between the two main tracks from rail to rail was from six and a half feet to six feet and eleven inches.   With two passenger trains going in opposite directions, there was not room enough to stand between them.   The plaintiff and Sullivan had got about opposite the middle part of the paint shop, where there was a " two-throw " switch between the westerly rail of the track and the paint shop, when Sullivan crossed over to the space between the paint shop and the west track, and the plaintiff, looking ahead, noticed a passenger train in motion to back down on the east or up main track.   It started from the north

side of the entrance to Hampden Park; the engine was on the
north end of the train, and there were two or three cars attached
to it; and above the engine the atmosphere was smoky.   The
plaintiff continued along until he had gone about two thirds of
the length of the paint shop, that is, up to another switch also
between the westerly rail of the down main track and the paint
shop, when he turned round and saw a train about two hundred
or two hundred and twenty-five feet away, backing up on the
down main track.   The train was coming from the depot, and
was going at the rate of about ten miles an hour.   When the
plaintiff looked back, the rear end of the other train, which was
backing into the depot on the up main track, was right over the
bridge at the entrance to Hampden Park.   The plaintiff looked
at his watch and started to go across and get out of the way, so
as not to get caught between the two trains.   As he went across,
he noticed a banjo signal, so called, on the west of the down
main track and just south of the Hampden Park bridge, showing
a white face with a dark centre in the middle, which showed
that there was a train coming upon that track from the north
and in the same block with the signal.   As the plaintiff was
crossing the down main track to get out of the way of the
trains, his foot caught upon a wire and he fell down, and, though
he tried to get his foot off, he was held by the wire in such a
position that the train, backing out of the depot on the down
main track, ran over his foot, necessitating amputation.   The
wire upon which the plaintiff caught his foot was part of an
electric signal system used by the defendant at particular points
on its road, the wire being placed at each point in the track
where the ends of two rails meet, the object of the wire being
to make sure that the current of electricity will be carried, even
though the strap iron which is ordinarily used in fastening
the rails together should become rusty.   The wire was a piece
of ordinary galvanized wire, about three sixteenths of an inch
in diameter, either end being affixed to the web of either rail
by a bolt of some description.   The wire ran along the web of
the rail until the tie or sleeper was reached, when it ran out on
the tie or sleeper in a U-shaped loop, which was fastened by
staples at the extreme point and at each of the other two ends
of the loop upon the tie.   The wire upon which the plaintiff

tripped stood up in the air two or three inches above the rail. Another workman in the employ of the defendant had noticed it in the latter part of November, when it stood up from the tie; it was not fastened, had no staple in it, and it was substantially in the same condition on the day when the plaintiff got hurt, except that it stood up higher. The wire was inside of the west rail of the down main track, and was from seven to fifteen feet south of the Hampden Park bridge. The train which struck the plaintiff was the "Owl" train, so called, which was due in the Springfield depot at 7.25 A. M.

The plaintiff further testified that he knew the times when trains were due; that when trains run into the station at Springfield they have to back out into the yard; that he had "braked" on a train that was accustomed to back out into the yard, — the train that leaves at 8.10 P. M. out of Springfield to go to Windsor, Vermont, and back at 7.25 in the morning; that he was brakeman occasionally on that train; that that was the train which ran over him; that the tracks east of the main tracks were switch tracks for freight trains; that the freight trains are constantly moving about there, switching; that when he went out there he knew a train was due from the north; that he knew that the regular trains were liable to come at any time, and freight cars were liable to be switched on the side tracks; that the trains on the main track might be expected to arrive on time; that when they came out of the depot and were going beyond the side tracks up as far as the paint shop, he had seen them back up on the up main track, the track which the cars would go on naturally as they were going north; that he had seen the "Owl" train back out on the east track, and he had backed them himself on the east track; that he would cross over from the depot on the east track, then go up north of the bridge, then switch back on the west track, and then kick the cars on that track; and that he had done that a hundred times when he was on the train.

The plaintiff was asked, upon cross-examination, if there was anything to hinder his going upon the street, and replied that there was a stone wall and a fence three and a half or four feet high at the east side of the railroad, next to the highway.

The evidence for the defendant tended to show that the plain-

tiff had charge of the electrical system of the defendant, which consisted of eight miles of electrical apparatus, spread over fifty miles of railroad; that, upon the morning of the accident, the plaintiff was seen walking north on the track by the paint shop; that there was a brakeman on the rear end of the train which struck the plaintiff, who hallooed to warn the plaintiff of his danger; that the plaintiff appeared to look around the last time the brakeman hallooed; that when the plaintiff left the pay car he passed by the train which afterwards ran over him; that the train was then standing still on the down main track near the pay car, and some of the men on the train spoke to the plaintiff; that at the time of the accident the train which struck the plaintiff was being kicked on to a side track, which left the main track a little north of the Hampden Park bridge, in the ordinary course of the defendant's business; that at the time when the plaintiff was struck the train was going six or seven miles an hour; that the ends of the two trains passed each other at the southerly end of the paint shop; and that the wires at the joint on the bridge, and at the joint next south, were laid flat along the rail at the time of the accident.

The rear end brakeman of the train that struck the plaintiff, called as a witness by the defendant, testified that he asked the plaintiff, immediately after the accident, if he did not hear him hallooing, and the plaintiff said, " Yes, but I thought it was the other train "; that the plaintiff was excited at the time; that the witness told the plaintiff that he had done all he could for him; and that the plaintiff swore at him, and said he had not.

One Higgins, a witness for the defendant, testified that, on the morning of the accident, he was standing right north of the bridge, waiting for this train to back from the depot, and was looking out for the train that was coming down from Holyoke at the same time, to flag it; and that he did flag the train, and it stopped.

Evidence was also admitted, against the plaintiff's objection, tending to show that the plaintiff had, on several occasions, boasted about his ability to keep out of the way of trains and not get hurt; and the plaintiff excepted.

The treasurer of the defendant corporation testified that the plaintiff had signed his name to the pay-roll under the heading

" Machinist," from December, 1887, to December, 1892; that he received $1.75 a day; that the pay-rolls were made out before they were signed; that in no place on the pay-roll was the plaintiff distinguished as an electrical machinist or electrical engineer, or anything of that kind; that the wages of machinists were from $4.00 to $1.35 a day, and that the average wages of a machinist who had learned his trade were $2.25 and the average wages of brakemen $1.75 a day.

The plaintiff, called in rebuttal, testified that it was no part of his duty to examine the wires in question, or to see whether or not they were securely fastened; and that he never did it.

He denied the conversations about his ability to escape trains, and he also denied that he had passed the train that struck him while it was standing still, and that he had talked with any of the men on the train.

At the close of the evidence, the judge, at the request of the defendant, ruled that, upon the whole evidence, the plaintiff was not entitled to recover; and directed the jury to return a verdict for the defendant. The plaintiff alleged exceptions.

*J. B. Carroll,* for the plaintiff.

*F. P. Goulding,* for the defendant.

ALLEN, J.    There is no doubt that the wires were a part of the ways, works, and machinery of the defendant. The grounds chiefly relied on by the defendant for sustaining the ruling made at the trial are, that, on the evidence, the plaintiff himself was charged with the duty of keeping the electric system in repair; that, if there was any fault with the wires, it was in part at least owing to his own negligence; that there was no evidence showing a violation of any duty which the defendant owed to the plaintiff, even if the wire was out of place; that it was not necessary that he, on his way to his work, should pass up through the yard, or at any rate that he should walk between the two main tracks; that in crossing the track he was not in any place where he was expected to be, in the performance of his duty; that the defendant was not bound to keep the track in such a condition that it would be safe and convenient for him to cross at that place; and that it is not reasonable to hold that the defendant's supervision of repairs on the road-bed should extend to such details.

It seems to us that the plaintiff was entitled to go to the jury upon all of these questions. They all involved matters of fact, upon which the evidence was not so clear and undisputed as to enable a judge to dispose of the case as a matter of law.

The evidence of previous boasts by the plaintiff as to his ability to keep out of the way of trains and not get hurt was competent, as bearing upon the question of his carefulness or readiness to take risks. *Exceptions sustained.*